IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

LEJAMES NORMAN,

        Petitioner,

    VS.                    Cause No.    6:12-cv-54

WILLIAM STEPHENS, Director,      Death Penalty Case
Texas Department of Criminal
Justice, Institutional Division,

        Respondent

## PETITION FOR HABEAS CORPUS

COMES NOW LeJames Norman, Petitioner in the above captioned cause and pursuant to 28 U.S.C. § 2254 submits to this Court his Petition for Habeas Corpus.

## **PROCEDURAL HISTORY**

On January 17, 2006 Mr. Norman was indicted by a Jackson County, Texas grand jury on the charge of capital murder for the murder of Sam Roberts, Tiffany Peacock and Celso Lopez during the course of committing or attempting a robbery during the same scheme or transaction.

On November 20, 2008 the Petitioner entered a plea of guilty to all of the counts in the indictment. The State put on witnesses to support the guilty plea and on December 10, 2008 the jury rendered its verdict on the special issues and the Court sentenced the

Petitioner to death. *Texas v. Norman*, No. 06-1H7346, 24th Judicial District, Jackson County, TX.

The Petitioner appealed the jury's verdict to the Court of Criminal Appeals, and on February 16, 2011, the Texas Court of Criminal Appeals issued its decision denying the Petitioner's appeal. *Norman v. State,* No. AP-76,063 (Tex. Crim. App. 2011) (unpublished).

The trial court appointed Terry McDonald to represent Mr. Norman in a post-conviction writ of habeas corpus under Article 11.071.  On May 7, 2010 the State filed brief on the Petitioner's  direct appeal. Pursuant to Article 11.071 4a counsel should have filed  the Petitioner's state writ application no later than June 21 2010.

However,   the trial court granted counsel's timely motion requesting a 90-day extension for filing the application making the application due in Jackson County no later than Monday September 20 2010. McDonald filed the writ application in Victoria County instead. On November 3, 2010 the Court of Criminal Appeals ordered McDonald to file an affidavit explaining the circumstances surrounding his filing of the application.

Based on counsel's affidavit, on December 8, 2010 the Court of Criminal Appeals issued an Order holding  that the application was to be considered timely filed in Jackson County as of September 28, 2010 and  ordered the trial court to proceed with its review of the application. *Ex Parte LeJames Norman*, No. WR47,743-01 (Tex Crim. App. Dec. 8, 2010).

On May 24, 2011 the state filed its Response to the Petitioner's application for habeas corpus and on May 25, 2011 the trial court issued an Order directing the parties to file proposed finding of fact and conclusions of law.

On June 23, 2011 the trial court issued its Findings of Fact and Conclusions of Law and recommendation that the Court of Criminal Appeals deny the Petitioner's claims for relief.

On August 24, 2011 the Court of Criminal Appeals issued an Order remanding the Petitioner's case to the trial court for further findings pertaining to allegations of false or inaccurate testimony from A.P. Merrilat at the punishment phase that counsel for the Petitioner raised in his application for habeas corpus.

On October 11, 2011 the State filed additional proposed findings of fact, and on October 18, 2011 the trial court filed Additional Findings of Fact and Conclusions of Law with a recommendation that the Court of Criminal Appeals deny the Petitioner relief.

On March 31, 2012 the Petitioner filed a subsequent application for habeas corpus in the trial court.

On August 22, 2012 the Court of Criminal Appeals issued an Order adopting the findings of fact and conclusions of law of the trial court and denied the Petitioner relief. *Ex Parte Le James Norman*, Nos. WR-74,743-01 and 74,743-02 (Tex. Crim. App. Aug. 22, 2012)(unpublished).

Undersigned counsel was appointed on September 26, 2012.

### **STATEMENT OF FACTS**
PETITION FOR HABEAS CORPUS
Page 3

The facts and circumstances pertaining to the conviction and sentence of the Petitioner were set forth in the opinion of the Court of Criminal Appeals denying the Petitioner's appeal:

> Appellant pled guilty to a capital-murder indictment that charged him with using a firearm to murder three people (Sam Roberts, Tiffani Peacock, and Celso Lopez) in the course of committing or attempting to commit burglary or robbery during the same transaction or scheme. Following a guilt phase proceeding at which the State presented evidence to support appellant's guilt, the trial court instructed the jury to find appellant guilty as charged in the indictment, and the jury did so. Pursuant to the jury's answers to the special issues at the punishment phase, the trial court sentenced appellant to death. . . .
>
> The evidence presented in this case supports findings that appellant and an accomplice named Ker'sean Ramey murdered the three victims in their home in the course of committing burglary and robbery. (The three victims, who were appellant's neighbors, were shot multiple times. Appellant testified at the punishment phase and claimed that he was remorseful and that he wanted to

apologize for murdering the victims. He also testified about a troubled childhood, including his father being shot and killed by police in California. Appellant claimed that it was mitigating that he cooperated with the police by confessing to this capital-murder offense and that he assisted the prosecution by testifying against Ker'sean Ramey without any kind of a deal for doing so. Appellant also testified that he had a dream in which he apologized to one of the victims (Tiffani) for murdering her.

*Norman v. State, supra* at 2.

Attorneys Elliott Costas and Keith Weiser were initially appointed to represent Mr. Norman in the capital proceedings. Mr. Costas initially retained Mark Cunningham, PhD, to meet with Mr. Norman and consult with counsel about the possibility of testifying at the punishment hearing. Dr. Cunningham met with Mr. Norman at the county jail, but did no testing, did not discuss the details of the offense, but confined his interview to the matters of Mr. Norman's behavior while in custody and his family and social background. *See* 3 RR, Def. Exhibit 1. Although he conducted no testing, based upon some of the events in Mr. Norman's childhood, *e.g.* witnessing his father being shot to death by police and his cousin sustaining gunshot wounds, Dr. Cunningham noted the possibility that Mr. Norman suffered posttraumatic stress disorder (PTSD) as a result of those traumatic

childhood events.   He made notations about the various mitigating evidence gleaned from the interview.

Trial commenced with jury selection. During the voir dire, the District Attorney of Jackson County, Bobby Bell, served an outrageously overbroad subpoena *duces tecum* on Dr. Cunningham asking for all of Dr. Cunningham's records for every case he'd been involved in during the ten years preceding Mr. Norman's trial. He also asked for all of Dr. Cunningham's tax records and other personal data. Mr. Costas sought to quash the subpoena but the trial court denied that request.  Lawyers from all over the country filed documents voicing their objections to the disclosure of their client's files.   Dr. Cunningham was forced to retain counsel but subsequently withdrew from Mr. Norman's case due to these conflicts with the prosecution. *See* 1 CR at 175 -182. Shortly after Dr. Cunningham withdrew, lead counsel Elliott Costas filed a motion to withdraw as counsel along with a memorandum setting forth his inability to formulate a viable mitigation strategy and continue the case without Dr. Cunningham. *See* 1CR 183, 198-209.  *See also* 33 RR at8-126. The Court denied Mr. Costas' motion. 1 CR at 210.

On January 15, 2008 Mr. Costas filed a second motion to withdraw, once again citing  his inability to secure a testifying mitigation expert. 2 CR at 296-315.  This motion was  granted on January 28, 2008. *See* 34 RR at 4, 2 CR at 321. After Mr. Costas withdrew from the case, at the recommendation of the prosecution, Allen Tanner  was appointed as lead counsel and Keith Weiser remained as second chair counsel. *Id* at 4-6.

Counsel has obtained a declaration from Elliott Costas setting forth the facts surrounding his representation of Mr. Norman and the attempt by the prosecution to intimidate Dr. Cunningham by filing an outrageous subpoena request for his tax records and all case files he worked on for ten years during the middle of jury selection. The Declaration also sets forth the fact that it was the prosecution who chose Allen Tanner, Mr. Costas' replacement. Due to computer problems and the AEDPA deadline, however, the declaration was not yet available in PDF format, but counsel will submit the declaration to the Court as soon as it is received.

Mr. Tanner retained the services of Micki Perry, a licensed social worker, to conduct a mitigation investigation. She conducted interviews, reviewed documents of Mr. Norman's history, including school records, past criminal history, etc. and  interviewed the client and his family members. As also noted by Dr. Cunningham in his initial interview with Mr. Norman, Ms. Perry found that Mr. Norman was exposed to an extraordinary level of violence as a child. He witnessed his father's violent death when the police shot him in the back. He was exposed to a lot of domestic violence.

Based upon the information she gleaned from her interviews with Mr. Norman and the fact that he suffered from continuing series of nightmares and images of his father, Ms. Perry raised the issue of childhood PTSD and suggested that a neuropsychologist be retained  to evaluate Mr. Norman in order to provide the jury with a psychological framework  to put Mr. Norman's horrific childhood environment in a context which would enable the jury to understand how these events can severely impact a child's

development and hinder his ability to interact with others and in society. A copy of Ms. Perry's Declaration is annexed hereto as Exhibit "A"[1].

Although Mr. Tanner agreed with the suggestion to employ a neuropsychologist and secured the funding to do so, the neuropsychologist approved by the trial court, Mohammad Hamza was not available. Instead, Dr. Hamza's office partner, Curt Wills, who had no neuropsychological training or experience, and against the strong recommendations of Ms. Perry, administered tests that had virtually no mitigation value and in fact reflected negatively on Mr. Norman to the point wherein counsel was unable to use him as a witness.

Notwithstanding this egregious mistake and failure to do the neuropsychological testing by Dr. Wills, the psychologist who performed the testing, and the fact that it was specifically recommended that a neuropsychologist be retained, trial counsel took no steps to retain another psychologist to do the necessary testing, thus leaving the field wide open for the prosecution to put a horrific gloss on Mr. Norman's conduct from childhood onward. *See, e.g.,* 92 RR at 11-36, 98 RR at 43 *et. seq.*

At trial Mr. Tanner presented a number of witnesses on Mr. Norman's behalf, including family members, the mother of his children, former employers and former teachers, and also introduced Mr. Norman's school records into evidence. Due to trial counsel's failure to follow through on the important issue of obtaining a

---

[1]     Ms. Perry has married and the Declaration is given under her married name of Micki Rushton

neuropsychological evaluation, however, no evidence of Mr. Norman's possible childhood PTSD, which could have explained the onset of the Petitioner's criminal behavior at the age of 10 years old, or was introduced. Similarly, Due to Dr. Wills' failure to follow the explicit instructions of Ms. Perry-Rushton

Also, and against the advice of his attorney, Mr. Norman took the stand and testified on his own behalf. His testimony and relentless cross examination by the prosecution extended over a period of three days, during which the prosecution had unfettered access to the Petitioner regarding both his criminal history and the numerous statements he had given to law enforcement and at the trial of his co-defendant.

Upon Mr. Norman's conviction and sentence of death Vincent Callahan was appointed to represent Mr. Norman on his direct appeal and Terry McDonald was appointed as his state habeas lawyer.  Mr. McDonald retained a mitigation expert named Ann Matthews to assist him in the preparation of the Petitioner's application for habeas corpus. An affidavit containing the contents of Ms. Matthews' affidavit was attached to the Application for Habeas Corpus filed by Mr. McDonald as an Exhibit.

As evidenced and set forth in Ms. Matthews' affidavit, she was a licensed professional counselor with **no background in social work** , and her so-called "investigation" consisted mainly of interviews with Mr. Norman and some members of his family and consultation with an unnamed "prison expert." Although Ms. Matthews claims that she attempted to obtain the psychological and mitigation records but was unable to do so, it is clear from Ms. Perry-Rushton's declaration  that neither she nor Mr.

McDonald obtained or attempted to obtain the file of trial counsel Allen Tanner, which undersigned counsel obtained with no difficulty. The file consisted of 6,800 pages and contained Ms. Perry's complete mitigation file and the records Ms. Matthews claimed she could not obtain .

It is also clear that Ms. Matthews' review of the record was at best cursory, as witnessed by the fact that she listed the testing psychologist in Mr. Norman's case as Dr. Jack Greeson, who actually took no part in the case other than in an advisory capacity to attempt to secure a mitigation expert for attorney Elliott Costas. *See* 33 RR at 7 *et. seq.* Further, although Ms. Matthews claims to have interviewed members of Mr. Norman's family, it is clear from her affidavit that she made no effort to read the record, since much of the evidence regarding Mr. Norman's background that she claims was not introduced at trial was in fact put on by Mr. Tanner in his case in chief.

As noted above and in the declaration of Ms. Perry-Rushton, given the chaotic and traumatic childhood of Mr. Norman, a thorough neuropsychological work up within the context of a complete psychosocial history was essential to Mr. Norman's defense if there was any chance of obtaining a life verdict in the face of the horrific offenses he pled guilty to, and trial counsel's failure to secure any follow-up testing and investigate the issue of PTSD clearly prejudiced Mr. Norman's case.

Further, the District Attorney's efforts to intimidate Dr. Mark Cunningham, a renowned expert on prison violence and future dangerousness, left Mr. Norman with no ability to rebut the testimony of A.P. Merrilat, the State's expert on future dangerousness

and prison violence.[2]   The trial court's failure to quash the overbroad subpoena which sought information that violated the attorney client privilege of all of Dr. Cunningham's prior clients also deprived Mr. Norman of the effective assistance of counsel.

Further, the flimsy attempt of state habeas counsel to formulate and develop a proper ineffective assistance of counsel claim without doing the investigation and securing funding for the testing that was essential to the preparation of the claim *i.e.*, obtaining and reviewing trial counsel's file, has once again prejudiced Mr. Norman in leaving a substantial ineffective assistance of counsel claim not fully developed and subject to procedural default. Had state habeas counsel or his so-called "expert" picked up the phone and called Mr. Tanner they would have had immediate access to his file and all of the information they claim was not secured by trial counsel.

On June 20, 2011 Mr. McDonald filed his proposed findings of fact and conclusions of law which consisted of a total of **three** pages of text and, as noted above, on August 22, 2012 the Court of Criminal Appeals issued an Order adopting the findings of fact and conclusions of law of the trial court and denied the Petitioner relief. *Ex Parte Le James Norman, supra*.

Based upon the foregoing facts the Petitioner's sets forth the following claims for relief.

## **FIRST CLAIM FOR RELIEF**

---

[2] This was particularly damaging in light of Mr. Norman's attempted escape while in custody awaiting trial.

**(Ineffective Assistance of Trial Counsel)**

**THE ACTIONS OF THE PETITIONER'S TRIAL COUNSEL IN FAILING TO OBTAIN THE NEUROPSYCHOLOGICAL EVALUATION RECOMMENDED BY HIS EXPERTS AND INVESTIGATE THE ISSUE OF POST TRAUMATIC STRESS DISORDER FELL SO FAR BELOW THE STANDARD OF CARE REQUIRED OF COUNSEL TRYING CAPITAL CASES AS TO CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL AND A DENIAL OF THE PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION**.

### Law governing claims of ineffective assistance of counsel

Claims regarding the a violation of a Petitioner's Sixth Amendment right to effective assistance of counsel are  governed by *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052 (1984). To demonstrate a violation of this right a  petitioner must prove: 1) that counsel's representation fell below professional norms; and 2) there is a reasonable probability that but for counsel's deficiency, the result of the trial would have been different.  466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068.

Certain choices of counsel that are considered as part of "trial strategy," however, are considered exempt from challenge. *Id.* at 695.

Effective counsel is of paramount importance with regard to putting on a mitigation case at the punishment phase of a capital murder trial, the primary purpose of which is to focus on "the particularized characteristics of the defendant." *Hardwick v. Crosby,* 320 F.3d 1127, 1162 (11th Cir. 2003). This is because "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989), *quoted in Roberts v. Dretke,* 356 F.3d 632, 641 (5th Cir. 2004). Thus, mitigating evidence of a defendant's character or background is of constitutional dimension at the punishment phase of a capital trial because of its significance in the jury's ultimate decision whether to impose the death penalty. *Moore v. Johnson,* 194 F.3d 586, 612 (5th Cir. 1999). *See also Wiggins v. Smith,* 539 U.S. 510, 535 (2003) ("life history is part of the process of inflicting the penalty of death") (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 112 (1982)). Indeed, in a case such as that of Mr. Norman, where guilt is uncontested, trial counsel must appropriately focus on the punishment phase of trial. *See, e.g., Ex parte Davis,* 886 S.W.2d 234, 237 (Tex. Crim. App. 1993).

Given the undeniable importance of mitigating evidence in a capital sentencing proceeding, counsel's Sixth Amendment obligation to effectively represent his client

confers an equally important "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. at 396. "The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano v. Gibson,* 239 F.3d 1156, 1180 (10th Cir. 2001). Thus, it is "undisputable" that counsel's investigation into potential mitigating evidence must be "reasonably substantial" as well as "independent." *Lewis v. Dretke,* 355 F.3d 364, 367 (5th Cir. 2003) (quoting *Neal v. Puckett,* 286 F.3d 230, 236 (5th Cir. 2002)). Accordingly, "investigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating evidence . . . [including evidence of] family and social history." *Roberts v. Dretke,* 356 F.3d at 638, (quoting *Wiggins v. Smith*).

Of particular relevance to Mr. Norman's case is the settled rule that "a trial counsel's performance cannot be found adequate if it is supported by an unreasonably limited investigation." *Smith v. Dretke,* 422 F.3d 269, 280 (5th Cir. 2005) (citing *Rompilla v. Beard,* 125 S. Ct. 2456 (2005)). Even when trial counsel does investigate some mitigating evidence, a reviewing court nonetheless must decide "whether the investigation conducted could be considered adequate in light of professional norms." *Id.* (citing *Wiggins v. Smith*). Thus, "'strategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* at 283 (quoting *Strickland v. Washington*, 466 U.S. at 690-91). "If trial counsel's investigation was unreasonable then

making a fully informed decision with respect to sentencing strategy was impossible." *Id.* at 284 (citing *Wiggins,* 539 U.S. at 527-28). As was noted above, notwithstanding the fact that Ms. Perry-Rushton's report contained some compelling mitigation, counsel made no real effort to obtain this information.

With regard to the prejudice prong of *Strickland* at the punishment phase of a capital trial, relief is warranted when a defendant shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bell v. Cone,* 535 U.S. 685, 695 (2002), *quoted in Guy v. Cockrell,* 343 F.3d 348, 352 (5th Cir. 2003). A reviewing court should "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor,* 529 U.S. 397-98. In doing so, "courts must give due consideration to the quality and volume of the additional mitigating evidence." *Neal v. Puckett*, 286 F.3d 230, 243 (5th Cir. 2003). *Strickland* prejudice is shown when, "[h]ad the jury been able to place the petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 539 U.S. at 513. *See also Williams v. Taylor,* 529 U.S. at 398 (prejudice prong met where available mitigating evidence "might well have influenced the jury's appraisal" of the defendant's moral culpability), *quoted in Wiggins v. Smith,* 539 U.S. at 537.

Given the fact that Mr. Norman elected to enter a plea of guilty to the offense of capital murder with which he was charged, trial counsel was not burdened with the task of preparing for two separate proceedings, *i.e.*, a guilt phase and a penalty phase, and was thus given the opportunity to devote all of his time and resources to the investigation and development of a mitigation strategy. This was particularly important in the instant case, given Mr. Norman's chaotic, violent childhood and his becoming involved in criminal conduct at a very young age. [3]

Although the state habeas court found that trial counsel was not ineffective because he "presented many witnesses," and "acted diligently in investigating whether or not the Defendant/Relator had a 'chemical brain imbalance'[4] and decided as a matter of trial strategy not to call the neuropsychologist who did the examination to testify ," 1 CR (Supplemental) at 42 (internal quotation marks supplied), this finding is *per se* unreasonable because Mr. Tanner never had the neuropsychological evaluation done, and the reason no psychologist testified is that Dr. Wills did not follow the instructions of Ms. Perry-Rushton in his testing and also had no experience in the area of neuropsychology.

---

[3] In its closing argument the prosecution was relentless in bringing to the attention of the jury that Mr. Norman had committed a robbery when he was 10 years old. *See* 98 RR62-63, 68.

[4] The use of this term by Mr. Tanner, state habeas counsel and the court bespeaks a naiveté about psychology and neuropsychology that reflects trial counsel's complete lack of knowledge of the subject, which has acted to the detriment of his client, and the failure of counsel to follow the explicit recommendation of Ms. Perry-Rushton and employ the proper experts as a result of this lack of knowledge may very well cost Mr. Norman his life.

Further, and in contravention to the state habeas court's findings, a proper mitigation case is not contingent on the quantity of witnesses presented, but rather upon the presentation of a mitigation strategy, which was completely absent in Mr. Tanner's presentation. Instead, the only thing accomplished by the catalogue of witnesses he presented  was to give Mr. Bell multiple opportunities to recount Mr. Norman's criminal history and the details of the crime through his cross examination.

Similarly, his so-called strategy of failing to follow through  what was a viable mitigation strategy as suggested and developed by Ms. Perry-Rushton, cannot be construed as the basis for an exemption from the *Strickland-Wiggins* standard required of capital defense attorneys.

As Ms. Perry-Ruston notes in her Declaration, without some kind of psychological context in which to place Mr. Norman's background and behavior, the prejudice to his defense would be enormous and her request to have further testing done was ignored by Mr. Tanner, thus leaving the defense with no more than a handful of "character" witnesses and no psychological matrix within which he could have placed Mr. Norman's psycho-social history.

Similarly, state habeas counsel's claim that he was unable to locate the mitigation file  clearly shows that his investigation was, at the very least, cursory in that the information was contained in trial counsel's file.

Attached hereto as Exhibit "B" is a declaration of Michael B. Charlton that details the conversations he had with Dr. Hamza, the neuropsychologist who Ms. Perry-Rushton

selected to do the neuropsychological workup on Mr. Norman. As Mr. Charlton notes and sets forth in his affidavit, in his prior experience with Dr. Wills he found that Dr. Wills was not a neuropsychologist and also had been investigated and indicted for providing his patients with painkillers.

Mr. Charlton's conversations with Dr. Hamza confirmed both that Dr. Wills did not have the skills to perform a neuropsychological evaluation and that the tests he administered to Mr. Norman were completely inadequate for providing neuropsychological data that might reflect on the issue of neuropsychological impairment.

It is therefore respectfully submitted that notwithstanding the finding of the state habeas court that Mr. Tanner put on "many witnesses," his complete misunderstanding of the mitigation process, as evidenced by his and state habeas counsel's discussion of a so-called "chemical imbalance" and his failure to follow up on the explicit advice of his mitigation expert, **a licensed social worker on the absolute necessity of obtaining the neuropsychological evaluation** in order to present a complete picture of the effects of the damage inflicted upon Mr. Norman by his childhood environment, fell so far below the standard of care required of attorneys litigating death penalty case that it satisfies the first prong of the standard set forth in *Strickland v. Washington* and *Wiggins v. Smith, supra*.

Further, defense counsel's failure to obtain this evidence, which at the very least would have helped if not to explain, but at the very least put into context his client's

impulsive behavior beginning in his early childhood and culminating in his ridiculous escape attempt while in custody, resulted in prejudice which virtually assured that Mr. Norman would receive a death sentence.

## SECOND  CLAIM FOR RELIEF

**(Due Process Violation)**

**THE TEXAS COURT REFUSED TO ALLOW THE SENTENCING JURY TO FULLY CONSIDER AND GIVE EFFECT TO THE MITIGATING EVIDENCE BY PROHIBITING THE ATTORNEYS REPRESENTING THE STATE, THE DEFENDANT, AND THE DEFENDANT'S COUNSEL FROM INFORMING THE JURORS OR THE PROSPECTIVE JURORS OF THE EFFECT OF THE FAILURE OF A JURY TO AGREE ON THE ISSUES SUBMITTED IN VIOLATION OF THE 6TH, 8TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The following facts support this claim:

Texas refuses to tell its capital sentencing jurors the whole truth about how to give life. In the same manner as in his claims about the 10-12 rule, *See* Claim No. 9, *infra,* Mr. Norman's complaint addresses here another way that Texas interferes with the full

consideration of  mitigating circumstances. The Texas prohibition against revealing the fact that a single holdout juror could cause the prosecution to result in a life sentence, rather than a mistrial followed by a new sentencing hearing, is clearly intended to prevent a minority of life giving jurors, or even a single juror,  from actually exercising a veto of the majority's decision  for death.

*Penry I*, *Tennard  v. Dretke*, and  *Smith v. Texas* clearly establish that the Texas capital sentencing system must: 1) afford full jury consideration, not just some consideration, of mitigating circumstances; and 2) provide any life giving jurors an adequate vehicle to actually give effect to the defendant's mitigation case. It is respectfully submitted that the Texas statutory prohibition interfered with his jury's ability to give effect to his mitigation case in a substantial enough way to undermine confidence in the outcome of his trial. Thus, the writ must issue under  *Boyde v. California, supra*.

Although the Court of Criminal Appeals has previously rejected this argument in its decisions, those decisions are not controlling because they directly conflicts with the U.S. Supreme Court's decisions in *Penry I*, *Tennard v. Dretke*, and  *Smith v. Texas*. Therefore,  the state court's decision on this claim "was contrary to, [and] involved an unreasonable application of,  clearly established Federal law,  as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The foregoing violation of Mr. Norman's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of

whether the violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Norman's rights had a substantial and injurious effect or influence on Mr. Norman's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Norman's convictions and sentence.

In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims.  *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

## THIRD CLAIM FOR RELIEF

### (Due Process Violation)

**MR.  NORMAN'S  CONSTITUTIONAL  RIGHTS  WERE VIOLATED  BY  THE  PUNISHMENT  CHARGE,  WHICH**

**REQUIRED AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE FIRST SPECIAL ISSUE AND AT LEAST TEN "YES" VOTES FOR THE JURY TO RETURN AN AFFIRMATIVE ANSWER TO THE MITIGATION SPECIAL ISSUE.**

The following facts support this claim:

Mr. Norman's convictions, confinement, and sentence are illegal and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the punishment charge, required at least ten "no" votes for the jury to return a negative answer to the first special issue and at least ten "yes" votes for the jury to return an affirmative answer to the mitigation special issue. *See California v. Brown*, 479 U.S.538, 541(1985).

Article 37.071 violates the constitution, in that it requires that in order to answer Special Issue One "yes" the jury must unanimously agree, and to answer the issue "no" ten jurors must agree. Further, in order to answer Special Issue Two "no" the jury must unanimously agree, and to answer "yes" ten jurors must agree. It is respectfully submitted that this scheme is unconstitutional because this "12-10 rule" creates an irrational process which is death-weighted and death-driven.

Texas law requires that neither the court, the state, nor counsel for the defense may

inform a juror or prospective juror of the effect of the jury's failure to agree on special issues at punishment.   TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(a)(Vernon Supp. 2002).   All parties in this case acted in compliance with this statute.  *See* Claim No. 8, *supra.*

Texas law also requires that the capital sentencing jury be instructed that it may not answer the first special issue "yes" or the second special issue "no" unless 10 or more jurors agree.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 §§ 2(d)(2) & 2(f)(2)(Vernon Supp. 2002).

The "10-12 rule" contained in TEX. CODE CRIM. PROC. ANN. art 37.071[5] violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 294 (1990).  The "10-12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (I) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, *or* (iii) at least ten jurors must vote "yes" in answering the third special issue.  This "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special

---

[5]        *See* Robert J. Clary, *Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 ST. MARY'S L. J. 353, 358-59 (1987).

PETITION FOR HABEAS CORPUS
Page 23

issues, the jury could not return a life sentence.  Such a "majority rules" mentality could lead jurors to change their potential holdout votes for life to a vote for the death penalty.

As an illustration, consider the following hypothetical circumstance: at trial, four of the twelve jurors conclude that, as consequence of a capital defendant's positive character traits, he would not pose a future threat to society; thus, those jurors individually vote to answer the first special issue negatively. [6]

Assume that those four jurors also believe, however, that the defendant possessed the requisite *mens rea* under the second special issue (the "parties" special issue) and that there is insufficient mitigating evidence as a whole to result in an affirmative answer to the third special issue (the "*Penry*" special issue).

Further suppose that four other jurors believe that the same capital defendant did not possess the requisite *mens rea* under the second special issue and, thus, those four jurors individually vote to answer the parties special issue negatively.[7]  Assume, however, that those four jurors believe that the capital defendant does pose a future danger to society and that those four jurors also believe that the defendant's mitigating evidence, as a whole, is insufficient to result in a "no" vote to the statutory "*Penry*" special issue.

---

[6]

    Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized

    mitigating factor.  *See Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

[7]

    A capital defendant's lack of such a mens rea is, of course, a constitutionally relevant circumstance.  *Cf. Tison v. Arizona*, 481 U.S. 137 (1987).

Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood,[8] that the statutory *Penry* special issue should be answered affirmatively.   However, for whatever reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite *mens rea* under the "parties" special issue.   Thus, those four remaining jurors only vote in the defendant's favor on the third special issue.

Such a breakdown can be graphically illustrated:

| | *1st SPECIAL ISSUE* | *2nd SPECIAL ISSUE* | *3rd SPECIAL ISSUE* |
|---|---|---|---|
| Juror 1: | **NO (life)** | YES (death) | NO (death) |
| Juror 2: | **NO (life)** | YES (death) | NO (death) |
| Juror 3: | **NO (life)** | YES (death) | NO (death) |
| Juror 4: | **NO (life)** | YES (death) | NO (death) |
| Juror 5: | YES (death) | **NO (life)** | NO (death) |
| Juror 6: | YES (death) | **NO (life)** | NO (death) |
| Juror 7: | YES (death) | **NO (life)** | NO (death) |
| Juror 8: | YES (death) | **NO (life)** | NO (death) |

---

[8]     Of course, the third ("*Penry*") special issue also implicates a potentially limitless range of mitigating factors, including "troubled background" evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

| Juror 9: | YES (death) | YES (death) | **YES (life)** |
| Juror 10: | YES (death) | YES (death) | **YES (life)** |
| Juror 11: | YES (death) | YES (death) | **YES (life)** |
| Juror 12: | YES (death) | YES (death) | **YES (life)** |

Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established and that, under state law, a life sentence is appropriate. That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life. However, jurors are given the impression that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed. In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate. *See McKoy v. North Carolina, supra; Mills v. Maryland, supra*.

Accordingly, Mr. Norman's sentence of death must be vacated and the cause remanded for a new trial.

The foregoing violation of Mr. Norman's constitutional rights constitutes

structural error and warrants the granting of this Petition without any determination of whether the violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 & n.9, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). However, even assuming the harmless error doctrine applies to this claim, the foregoing constitutional violations so infected the integrity of the proceedings that the error cannot be deemed harmless.  The foregoing violation of Mr. Norman's rights had a substantial and injurious effect or influence on Mr. Norman's convictions and sentence, rendering them fundamentally unfair and resulting in a miscarriage of justice.

The constitutional violations set forth in this claim alone mandate relief from the convictions and sentence.  However, even if these violations do not mandate relief standing on their own, relief is required when this claim is considered together with the additional constitutional errors outlined in the remainder of this Petition.  Cumulatively, these errors mandate relief from Mr. Norman's convictions and sentence.

In addition, all prior counsel provided the ineffective assistance of counsel for failure to raise the bases for relief alleged in these claims. *Strickland*, 466 U.S. 668.  Due to the ineffectiveness of prior counsel in raising portions of the foregoing claim, this claim could not have been brought at a earlier time.

Wherefore the Petitioner respectfully requests that the Court grant his Petition and issue a writ of habeas corpus mandating that Mr. Norman receive a new trial, or in the alternative set this matter for a hearing.

RESPECTFULLY SUBMITTED this 22nd day of August, 2013.


/s/ Donald Vernay
Donald Vernay
1604 Golf Course Rd. SE
Rio Rancho, NM 87124
505-892-2766
State Bar of Texas No. 24035581
minimal243@yahoo.com

/s/ Michael B. Charlton
Michael B. Charlton
P.O. Box 51075
Eugene, OR 97405
(541) 636 -2793
State Bar of Texas No. 04144800
charltonlegal@gmail.com

Counsel for LeJames Norman

Exhibit A

IN THE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LEJAMES NORMAN, Petitioner | X | |
| | X | |
| V. | X | CAUSE NO.  6:12-mc-00003 |
| | X | |
| RICK THALER, Director, | X | |
| Texas Department of Criminal | X | |
| Justice, Institutional Division | X | |

**DECLARATION OF MICKI RUSHTON**

I, MICKI RUSHTON, declare as follows:

1.  My name is Micki Rushton.  I was the mitigation investigator
    for the trial of LeJames Norman.  While involved in the
    Norman case, I conducted interviews, reviewed documents of
    Mr. Norman's history, including school records, past criminal
    history, etc. I interviewed the client and his family members.

2.  Based on my workup, I developed a number of themes about
    mitigation presentation.   By themes, I mean concepts that
    should be presented to a sentencing jury that would offer that
    jury a reasonable basis to sentence Mr. Norman to life in prison
    as opposed to a death sentence.   These concepts offer an

argument that clients, like Mr. Norman, have impairments that render them morally less culpable for their actions.

3.    It was my opinion at the time that the evidence suggested a number of themes or concepts that might be offered to Mr. Norman's sentencing jury.  Mr. Norman was exposed to an extraordinary level of violence as a child. He witnessed his father's violent death when the police shot him in the back. He was exposed to a lot of domestic violence. He grew up in what can only be described in a Southern California town with a very high level of violence, gangs and criminal behavior. This suggested the possibility of infant or childhood PTSD, an impression reinforced by my interviews with Mr. Norman where he described a continuing series of nightmares and images of his father.  Additionally, there is a great deal of research linking this kind of childhood exposure to future drug addiction and usage.   There was a possibility of trauma to Mr. Norman's brain.

4.    It was and remains my view that these issues must be supported by expert testimony.  It is not enough for juries to simply hear about these events; they have to be provided a psychological

framework in order to put these events in context and to get an

understanding of how these events are linked together and the

impact these events have on a person's ability to interact with

his environment and other people, to live a successful life, and

to stay of out trouble. Events like these often create profound

impairments in a person's ability to make rational judgments

and control their behavior.   These events, especially PTSD, can

trigger incredibly severe fear responses that, when combined

with frontal lobe executive dysfunction, produce responses over

which a defendant might have very little control.  An expert

neuropsychologist can greatly assist in this explanation.

5.   A traditional forensic psychologist is ill equipped to make these

assessments.  They lack training and experience in

neuropsychology. The normal assessment instruments

employed by traditional forensic psychologists cannot

determine the existence and extent of damage to the frontal

lobes of the brain, the portion that contains the brain's

executive function.  This is essential to rational decision

making and is often seriously impaired in persons charged with

violent crime.  Neuropsychologists can determine as well, the

existence and extent of trauma related disorders and provide insight into addiction or drug use issues if they exist. Traditional forensic psychologists simply can't reach these conclusions.

6.   Based on this, I recommended to Allen Tanner, and he agreed, that we needed to retain the services of a neuropsychologist to do a full scale neuropsychological workup.  I recommended Mohammad Hamza from Nederland Texas who was available, though on a very tight schedule. Mr. Tanner responded with alacrity and immediately secured court approval for Dr. Hamza.

7.   I do not remember why Dr. Hamza was not available.  I do know that we learned he was not and that Dr. Curtis Wills would perform the assessment.  I made it clear to Allen that Dr. Wills should in no circumstance administer an MMPI; it was my view, supported by experience, that any MMPI administered to a prisoner would very likely yield strong evidence to support an argument that Mr. Norman would be categorized with Anti-social Personality Disorder; these diagnoses can often be vary damaging in a death penalty trial, despite its wide ranging presence in prison populations.

Further, I made it clear that there needed to be a complete neuropsychological workup.   Allen completely agreed.

8.   We had to wait a long time to get Dr. Wills' report.  I made repeated calls to his office and to no avail.  I finally got his report and was dismayed to learn that he had completely ignored our instructions.  He administered the MMPI with predictable results and his neuropsychological workup was non existent. His report was completely lacking when compared with reports I had received in other cases.  Again, Allen completely agreed.

9.   I've been informed by Michael Charlton that Dr. Wills knew very little about neuropsychology and, if that's accurate, it is certainly reflected in the work he did for us.  I recommended to Allen that we explain what happened to the trial judge and get additional funds for the neuropsychological evaluation that we need.  Allen agreed here as well.  I have no idea why it was never done. There might not have been enough time left or any number of other reasons, but I strongly believe that we needed to dispense immediately with the services of Dr. Wills.  Dr.

Wills never told us that he could not do these tests; had he done so, had he been forthcoming, we never would have used him.

10.   I've read the affidavit of Ann Matthews, the mitigation investigator hired by state post conviction counsel. Ms. Matthews recites a great deal of mitigating evidence but concludes at the end of the affidavit that based on her history and practice, she believed "that the jury should have been given LeJames' mitigation evidence so that they could have made an informed choice. She further stated:

> I find it extremely odd that the defense attorney would look to the prosecutor for guidance on mitigation. The mitigating evidence as told to me may have been significant enough to avoid the death penalty.

11.   The evidence recited by Ms. Matthews is precisely the evidence I developed and it was presented at trial.  I cannot explain how Ms. Matthews concluded that it was not presented; even a cursory reading of the appellate record demonstrates that it was both developed and presented. What was missing was expert neuropsychological testimony to place all of this evidence into context: how these events create impairments in people's lives.

12.   Ms. Matthews asserts that I kept all of the records obtained for
Mr. Norman and it is true that I kept the originals. However,
Allen was given copies of every document I had. I never would
have kept any of this information from the attorney under any
circumstance.

13.   Ms. Matthews asserts that at some point, she "learned the name
of the psychologist who tested LeJames pretrial, Dr. Jack
Greeson, who reportedly retired from practice after the trial."
She contends that she was unable to locate him or his files. I
have no idea who Dr. Jack Greeson is and he certainly was not
hired at our request. As I made clear above, we hired Dr.
Mohammad Hamza to perform a complete neuropsychological
battery and that later Dr. Curtis Wills performed an inadequate
assessment of Mr. Norman. I have no idea why Ms. Matthews
could not find his report as it was in Allen Tanner's files.

14.   Ms. Matthews contends that Mr. Tanner did not call an expert
because of the presence of a chemical imbalance; that is grossly
inaccurate.  There was never any evidence of such an
imbalance; the issue was that Dr. Wills did not follow our
instructions but instead used a psychological instrument we did

not authorize and never would have.  It yielded the predictable result of antisocial personality disorder and that was the reason we did not present Dr. Wills.

15.   Ms. Matthews asserts that Allen agreed not to present mitigation evidence because of an agreement with the prosecution; that is completely false. One, it is my strong belief that Allen never would have agreed to such a decision and two, we did present the mitigating evidence Ms. Matthews contends we should have.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I  UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED THIS _20th_ day of August, 2013

_Micki Rushton, MSW_

MICKI RUSHTON

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

LEJAMES NORMAN,

               Petitioner,

               VS.                         Cause No.    6:12-MC-003

WILLIAM STEPHENS, Director,          Death Penalty Case
Texas Department of Criminal
Justice, Institutional Division,

               Respondent

## DECLARATION OF MICHAEL B. CHARLTON

I, Michael B. Charlton, declare and state as follows:

1.     My name is Michael B. Charlton and I am one of the lawyers appointed to represent LeJames Norman in this action.  As part of my duties, I investigated the reasons why no expert testimony was presented at Mr. Norman's trial.  I learned from Allen Tanner's files that Mr. Tanner, at the request of his mitigation specialist, Micki Rushton, nee Perry that, upon her recommendation, sought and obtained permission from the trial court to hire Dr. Mohammad Hamza, a Nederland Texas neuropsychologist to perform neuropsychological testing with Mr. Norman. Yet, the only document in Mr. Tanner's files was a report from Dr. Curt Wills. I've had experience with Dr. Wills before in the case of Gaylon Walbey v. Thaler and knew that he was not a neuropsychologist.

2.      I also knew that Dr. Wills around 2008 was investigated for providing his patients with pain killers and later, around 2011, was indicted for that offense.  I could not understand why  he was involved and could not understand why he had given an MMPI, a testing which invariably, in the criminal forensics context, yields a anti social personality disorder diagnosis.

3.      Ultimately I found Dr. Hamza  who could not recall Mr. Norman.  After exchanging documents  with Dr. Hamza,  I ultimately learned from him that he was, in 2008, associated with Dr. Wills and that Wills had somehow taken over the Norman case without Dr. Hamza's knowledge. (Dr. Hamza was probably on vacation at the time the testing was needed, according to documents filed with the trial court).  Dr.  Hamza informed me that Wills had no business claiming that he could do a neuropsychological assessment because he had no training to do so. During their association,  Hamza did all of the neuropsychological testing because Wills simply did not know how to do it.  Hamza reviewed Wills report, and found that both the tests utilized  and the report generated were completely inadequate for providing useful neuropsychological data.  In effect, Dr. Wills took most of the $7500.00 dollars authorized for neuropsychological testing  but provided very little data that would shed any light on the issue of neuropsychological impairment.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE

TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I

UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT

AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED THIS  21 day of August, 2013

MICHAEL B CHARLTON