# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# VICTORIA DIVISION

LEJAMES NORMAN, §
§
  Petitioner, §
§
v. § CIVIL ACTION NO. V-12-054
§
WILLIAM STEPHENS, §
§
  Respondent. §

## MEMORANDUM AND ORDER

In December 2008, LeJames Norman pleaded guilty to capital murder. A separate punishment hearing resulted in a death sentence. After unsuccessfully availing himself of state appellate and habeas remedies, Norman seeks federal habeas corpus relief. The issue now before the Court is whether Norman has shown an entitlement to relief under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). Having considered the record, the pleadings, and the law, the Court must deny Norman's federal habeas petition.

## I.    NORMAN'S FEDERAL HABEAS PETITION

The issues raised by Norman's federal habeas petition frame this Court's review of the crime and his prior legal proceedings. Norman filed a federal petition for a writ of habeas corpus through appointed counsel on August 22, 2013. Doc. # 14. Norman subsequently amended his petition. Doc. # 52.[1] Norman raises two claims for relief

---

[1] Norman's initial federal petition raised three claims: (1) trial counsel provided ineffective assistance under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), by failing to investigate post-traumatic stress disorder; (2) the jury instructions limited the jury's consideration of mitigating evidence by failing to tell them the consequences of a holdout

(continued...)

arguing that trial counsel's representation fell below constitutional requirements under *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under *Strickland*'s two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

Norman's first federal claim challenges trial counsel's investigation into mental health issues. As will be discussed at length below, violence, lawlessness, and poverty swirled about Norman's childhood. The defense employed an investigator who recommended that trial counsel retain a neuropsychologist "to put Mr. Norman's horrific childhood environment in a context which would enable the jury to understand how these events can severely impact a child's development and hinder his ability to interact with others and in society." Doc.# 52, p. 6. Trial counsel retained the services of at least three *psychologists*, but did not follow the investigator's advice and have a professional with *neuropsychological* expertise examine Norman. Norman argues that, had trial counsel employed a neuropsychological expert, the defense counsel could have presented expert evidence similar to that which he has developed in these federal proceedings.

Second, Norman contends that the prosecution's "abuse of their subpoena power and the trial court's refusal to curb that abuse," caused trial counsel's representation to fall below constitutional expectations. Doc. # 52, p. 13. The defense

---

[1]     (...continued)

juror; and (3) the jury instructions created an unacceptable risk of coercing the jury into a death-worthy answer to Texas' special issue questions. Norman subsequently amended his petition and abandoned his two claims relating to the jury instructions.

hired Dr. Mark Cunningham to assist in developing a punishment phase defense. After the prosecution served a wide-ranging subpoena duces tecum on Dr. Cunningham, circumstances transpired that caused both Norman's first chair counsel and Dr. Cunningham to withdraw from the defense.   Norman asserts that, "[h]ad the prosecution not intimidated Dr. Cunningham with an abusively overbroad subpoena duces tecum, or had the trial court limited the scope of that subpoena duces tecum, Cunningham could easily have provided Mr. Norman's mitigation presentation with the expert assistance it needed."  Doc. # 52, p.13.

    With Norman's claims in mind, the Court next turns to a detailed summary of the efforts that Norman's trial attorneys made to defend against a death sentence and then summarizes the criminal and habeas proceedings.

## II.    __BACKGROUND__

### A.    __The Crime__

    On August 24, 2005, Norman and accomplice Ker'sean Ramey entered a neighbor's home in Edna, Texas, wearing masks with the intention of stealing cocaine.[2]  When Celso Lopez answered the door, the men forced their way inside. While Norman held Lopez at gunpoint, Ramey looked for the cocaine.  Norman then shot Lopez, allegedly by accident.  As the men forced the bleeding Lopez into a backroom, Tiffany Peacock and Sam Roberts came into the home.  Norman forced Peacock to her knees and shot her in the head.  Norman began tussling with Roberts

---

[2]    The Court takes the following factual recitation from the testimony Norman gave in Ramey's capital-murder trial.  Norman's testimony was read for the guilt/innocence phase of his own trial.  Tr. Vol. 89 at 8-74.  The state court proceedings in this case resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will refer to the record from Norman's state habeas proceedings as State Habeas Record at ___.  A supplemental record from his state habeas proceedings will be cited as Supp. State Habeas Record at __.

as he tried to flee.  Ramey fired his weapon when Norman told him to shoot Roberts.  While Roberts lay on the floor, Norman shot him several more times.  Ramey then returned to the backroom and shot Lopez dead.  The two men did not find any cocaine.  As they were leaving, Norman realized he had left something inside the house.  Ramey returned and shot the victims several more times to ensure they were dead.

Law enforcement officers soon arrested Ramey, but Norman fled to Mexico.  On January 6, 2006, U.S. Customs and Border Protection officers arrested Norman as he crossed the International Bridge into Brownsville, Texas, using false identification papers.

Norman cooperated with the State after his arrest.  Norman gave police statements confessing his role in the murder.  He voluntarily testified in front of a grand jury. On January 17, 2006, the grand jury returned an indictment charging Norman with capital murder.  Clerk's Record at 4-5.  Two days later, the trial court appointed Elliott Costas, Esq. to serve as lead defense counsel.  Clerk's Record at 6.  The trial court later appointed Keith Weiser, Esq. to serve as co-counsel.

Norman testified against Ramey in 2007.  The prosecution's preparations for this case followed their prosecution of Ramey.  Clerk's Record at 156.  For the case against Norman,  Norman's counsel knew the State would rely on much of the same testimony and evidence it used to convict Ramey.  *See* Tr. Vol. 2 at 12 (discussing the State's intention to rely on the same evidence in both trials).  Norman's trial attorneys thus had a detailed preview into the evidence against their client.  Norman's testimony on direct examination by the State in the Ramey case would be introduced in his own trial, foreclosing any guilt/innocence defense.

Norman pleaded guilty.  Tr. Vol. 88 at 20.  After the State presented evidence of Norman's guilt, including Norman's testimony from Ramey's trial, the trial court instructed the jury to find him guilty of capital murder.  Tr. Vol. 88 at 134-35.

The jury only had to assess punishment; it had to decide whether to impose life imprisonment or the death penalty. A Texas jury decides a capital defendant's sentence by answering two special issue questions:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

In your verdict you will answer "Yes" or "No."

### Special Issue No. 2

Taking into consideration all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of Life imprisonment rather than a death sentence be imposed?

In your verdict you will answer "Yes" or "No."

You are instructed that mitigating evidence is that evidence, if any, that you as a juror might regard as reducing the defendant's moral blameworthiness.

Clerk's Record at 389-90. Both parties presented extensive evidence at trial relating the special issue questions. The Court fully discusses below the defense's preparation for and presentation of testimony in the punishment phase of Norman's trial.

### B.     Initial Defense Preparations

The defense faced an onerous hurdle in the punishment phase of trial. The State presented testimony and evidence showing Norman's life-long, and escalating, criminal actions. The State presented evidence that, when Norman was ten years old, he committed two robberies involving a firearm on the same day. At age eleven, Norman committed three burglaries. Through his teenage years, Norman repeatedly engaged in crimes. Norman began using drugs at a young age and began selling them

5

also.  At age fourteen, Norman committed criminal trespass and criminal mischief. He assaulted his girlfriend at age eighteen.  Norman was nineteen years old when he committed the murders giving rise to this case.

The jury was presented with evidence of the brutality and senselessness of the murders, as well as Norman's acts thereafter.  Immediately after the killings, Norman went to his girlfriend's house, took drugs, and had sex with her.  Norman then fled to Mexico.  While on the run, Norman sold drugs.  The prosecution also presented damaging evidence that, while in the county jail awaiting trial for capital murder, Norman made weapons, planned escapes, and talked about murdering people.  During an unsuccessful escape attempt with another inmate, Norman held a shank to the neck of a 63-year-old female jailer and threatened to kill her.

With that background, the defense struggled to show that Norman would not be a future danger and that mitigating circumstances warranted a life sentence.  In support, Norman pointed to his actions that assisted the police immediately after his arrest.  Norman voluntarily gave recorded statements to law enforcement officers without counsel present.  Norman also testified before the grand jury on January 16, 2006, without legal representation. In his pre-indictment statements, Norman accepted responsibility for his actions and displayed remorse.  Norman's remorseful attitude was a pillar of the defense's case.

Norman's attorneys focused their efforts at securing favorable answers to Texas' special issue questions.  While the record does not contain any indication of how the two attorneys divided the pre-trial responsibilities, the attorneys together oversaw a robust investigation into Norman's background.  To that end, Norman's first set of attorneys hired at least two psychologists: Dr. Jack Greeson and Dr. Mark

Cunningham.[3]

Norman mistakenly asserts that Dr. Greeson "actually took no part in the case other than in an advisory capacity to secure a mitigation expert for attorney Elliot Costas." Doc. # 52, p. 10. According to Mr. Costas, Dr. Greeson operated as a "[m]itigation specialist" and "accumulated a vast amount of information." Clerk's Record at 199; Tr. Vol. 16 at 5. The record indicates that Dr. Greeson performed a significant amount of work in the initial stages of the defense case. *See, e.g.,* Tr. Vol. 16 at 8-9. Dr. Greeson traveled to various cities to interview Norman's family members. Tr. Vol. 16 at 8-9. Dr. Greeson may have performed a psychological examination, State Habeas Record at 26, but the record does not divulge any resulting conclusions. Dr. Greeson, however, was a "consulting expert" and the defense never intended him to testify. Clerk's Record at 173.[4]

Dr. Greeson forwarded the results of his efforts to Dr. Cunningham. Clerk's Record at 199. The defense hired Dr. Cunningham because he is "a licensed psychologist in Texas as well as other numerous states, who is a leading expert on the 'future danger' and other mitigation issues." Clerk's Record at 200. Dr. Cunningham described the role given to him by trial counsel: "I have been retained by Mr. Norman's defense counsel to evaluate factors that could be considered mitigating by his capital sentencing jury as well as to evaluate 'whether there is a probability that the defendant would commit criminal acts of violence that would constitute a

---

[3]     On November 19, 2007, defense counsel sent a letter to the prosecution attempting to late designate a punishment expert by the name of Susan Perryman-Evans. Clerk's Record at 170. The record does not contain any additional information about that expert.

[4]     In Texas, "the world of experts is divided into two parts: consulting experts and testifying experts." *Pope v. State*, 207 S.W.3d 352, 359 (Tex. Crim. App. 2006). In criminal cases, a consulting expert is an agent of the attorney and any resultant materials are protected attorney work product. *See Skinner v. State*, 956 S.W.2d 532, 538 (Tex. Crim. App. 1997).

continuing threat to society.'"  Tr. Vol. 3, Exhibit 1.  The pre-trial preparations suggested that the defense anticipated that Dr. Cunningham would testify at trial, but elsewhere the defense held Dr. Cunningham out as only a "consulting expert." Clerk's Record at 42.

On September 27, 2007, Dr. Cunningham "conducted a face-to-face contact interview of Mr. Norman in the county jail lasting 4 hours and 28 minutes." Tr. Vol. 3, Exhibit 1.  Norman's pre-trial confinement would provide difficult issues for the defense to address in crafting a case that he would not be a future danger.  Before his testimony in the Ramey case, Norman held a shank to a jailor's neck during an escape attempt.  Jailors found what they characterized as "weapons" in his cell on at least two other occasions, including during a search made prior to Dr. Cunningham's visit.  Tr. Vol. 3 at 14-15.

Dr. Cunningham's "evaluation consisted entirely of interviewing Mr. Norman and involved no psychological testing or application of structured interviewing instruments." Tr. Vol. 3, Exhibit 1.  Dr. Cunningham's inquiry involved questions "regarding Mr. Norman's pre-trial confinement in the county jail and included queries regarding his attempted escape, his past correctional confinement, his multi-generational family history, his observation or knowledge of interactions between family members and others from childhood to date, and multiple other aspects of his childhood and adult history." Tr. Vol. 3, Exhibit 1.  Dr. Cunningham's review, however, was limited somewhat because "[o]n advice of defense counsel Mr. Norman was not questioned nor did he offer information regarding the capital offense(s) or any violent offenses for which he was never arrested."  Tr. Vol. 3, Exhibit 1. The record does not contain a report for Dr. Cunningham describing the results of his investigation, but it does contain a copy of what purport to be his notes

from interviewing Norman.[5]

The defense team, including both experts, met to discuss strategy.  Tr. Vol. 24 at 40-41.   Jury selection began on October 29, 2007.   As the questioning of prospective jurors progressed through the next few months, dramatic events would cause a change in legal representation for Norman and delay trial for a year.

On November 14, 2007, Robert Bell, the Jackson County Criminal District Attorney, served a subpoena duces tecum on Dr. Cunningham. Clerk's Record at 175. Norman describes the prosecutor's actions as follows:

> Shortly after the trial commenced and during jury selection, the District Attorney of Jackson County, Bobby Bell, served an outrageously overbroad subpoena duces tecum on Dr. Cunningham asking for all of Dr. Cunningham's records for every case he'd been involved in during the ten years preceding Mr. Norman's trial.  He also asked for all of Dr. Cunningham's tax records and other personal data.  Subpoenas duces tecum were also served on lawyers all over the country who had used Dr. Cunningham's services seeking to compel them to produce their client's files.

Doc. # 52, p. 4.[6]  On November 23, 2007, Dr. Cunningham notified Mr. Costas by telephone that he was resigning from the case.  Dr. Cunningham faxed a letter to defense counsel on December 1, 2007, stating that he had resigned from the case.  Tr. Vol. 16 at 5.

On December 3, 2007, Norman's attorneys moved to quash the State's

---

[5]     Norman labels these writings a "report," though the record does not suggest that Dr. Cunningham's investigation ever reached the point that he prepared a written report for the defense.  Instead, the notations seem to reflect Dr. Cunningham's contemporaneous writings as he interviewed Norman.  Dr. Cunningham apparently did not perform a psychological examination, but did "note[] the possibility that Norman suffered severely as a result of [his] traumatic childhood events."   Doc. # 52, p. 4.

[6]     The parties have not identified if and where a copy of the subpoena duces tecum is in the state court record and the Court's review does not reveal its location.

subpoena.  Clerk's Record at 175-82.  Dr. Cunningham also secured legal counsel and filed his own motion to quash.  Clerk's Record at 257.  The subpoena's effect rippled throughout Dr. Cunningham's large pool of clients.  Attorneys from throughout the nation flooded the trial court with motions asking the trial court to quash subpoenas that would require them to divulge information about their own cases.  Norman's attorneys feared that the prosecution had created a circumstance which had "a chilling effect on death penalty counsel being able to retain the experts needed for zealous and effective representation for those against whom the State seeks the death penalty."  Clerk's Record at 202.

Mr. Costas asked to be removed as counsel in the case.  He asserted that the prosecution's broad subpoena caused "stresses and strains both, mental and physical, on first chair counsel" such that they resulted in "extreme prejudice to Defendant Norman's constitutional right to a fair trial."  Clerk's Record at 297.  Mr. Costas also argued that the subpoena hindered the defense's ability to craft a mitigation defense.

On December 17, 2007, the trial court held a hearing and quashed the subpoenas. Tr. Vol. 24 at 49.  The trial court, however, did not find that there was bad faith by the prosecution in issuing the broad subpoenas.  As jury selection continued, Mr. Costas again sought to withdraw from the case.  On January 24, 2008, the trial court found that "it would be in the best interests of LeJames Norman that Elliott Costas be allowed to withdraw."  Clerk's Record at 321.

### C.    <u>Preparation by the Attorneys Who Served at Trial</u>

On January 24, 2008, the trial court appointed Allen Tanner to serve as the new lead counsel.  Clerk's Record at 321-22.  Mr. Weisner continued as second chair.  The appointment of a new lead counsel reset the proceedings. On April 9, 2008, the trial court released the selected jury panel.  Voir dire proceedings commenced again on July 28, 2008, and the jury was sworn on November 20, 2008.

While the record does not give a full account of Mr. Tanner and Mr. Weisner's efforts, some elements are evident of their eleven-month preparations for the presentation of evidence. Mr. Tanner adopted all previous motions filed by former counsel. Because Norman never raised the instant claims in state court, the record does not identify what evidence was developed under his first and second set of attorneys. Presumably, and especially in light of Mr. Weisner's continued involvement in the case, the defense under Mr. Tanner's guidance built upon some of the evidence already developed.[7]

Mr. Tanner also secured the services of Micki Perry as a mitigation investigator, though the record does not detail when she joined the defense team or to what extent she relied on the efforts of the prior experts.[8] At some point, Ms. Perry recommended that counsel seek an evaluation by an expert in neuropsychology. Ms. Perry apparently felt that, because Norman "was exposed to an extraordinary level of violence as a child" and "[t]here was a possibility of trauma to Mr. Norman's brain," he may have suffered neuropsychological impairment. Doc. # 53, Exhibit 4, p. 2. Ms. Perry worried that the violence in Norman's background "when combined with frontal lobe executive dysfunction, produce[s] responses over which defendant might have very little control." *Id.* at 2-3.[9]

---

[7]     For instance, Mr. Tanner received a fax from Dr. Cunningham containing notes from his work on the Norman case. Doc. # 52, p. 6.

[8]     Ms. Perry apparently married sometime after the conclusion of trial and now goes by the name Micki Rushton. Norman attached what he calls a "Declaration of Micki Rushton" to his amended federal petition. Doc. # 62, Exhibit 1. Because it is not notarized, that document is of little evidentiary value. Ms. Perry's declaration mentioned that she has "no idea who Dr. Jack Greeson is and he certainly was not hired at our request." *Id.*

[9]     The defense did not call Ms. Perry as a trial witness. Mr. Tanner stated in his
(continued...)

Mr. Tanner retained Dr. Mohammad Hamza, a neuropsychologist. *Id.* at 4. According to Norman's federal habeas petition, Dr. Hamza was unavailable to perform an examination so trial counsel had his office partner, Dr. Curt Wills, perform a psychological examination. Dr. Wills was a clinical psychologist who did not have adequate training to qualify as an expert in neuropsychology.[10] Dr. Wills observed only "mild to moderate cognitive impairment" Doc. # 62, Exhibit 4.[11] Dr. Wills did not identify any specific neuropsychological or psychological problem; he simply reported "an indication of significant psychopathology." *Id.* Trial counsel chose not to call Dr. Wills as a testifying witness because "[h]is overall testimony would have been detrimental to [the defense's] case." Supp. State Habeas Record at 28. Dr. Wills apparently had told trial counsel that Norman "was not seriously impaired." Supp. State Habeas Record at 28. The defense did not present any expert testimony at trial.

## D.   **The Defense**

The prosecution called punishment-phase witnesses to recount Norman's early

---

[9]   (...continued)
affidavit:

> The record reflects that we put many many witnesses on the stand to offer evidence of mitigation. We did not call Micki Perry for mitigation because her beneficial testimony was related to the Defendant's violent upbringings which we proved through other witnesses. She had very damaging testimony as to the Defendant's lack of impulse control and lack of understanding consequences which would make him a continuing threat. It was trial strategy not to call her.

Supp. State Habeas Record at 28.

[10]   Norman also questions whether licensing problems should have prevented Dr. Wills from practicing psychology when he preformed the pretrial examination. Doc. # 52, p. 8.

[11]   In the copy of Dr. Wills' report provided by Norman, the pages are out of order and the document nowhere contains any conclusion. *See* Doc. # 62, Exhibit 4.

onset of violent criminal activity.  As previously noted, Norman was violent as a youth and his criminality crescendoed through his teenage years.  The murders in this case were brutal and senseless.  Pre-trial incarceration did not squelch his lawlessness. The prosecution presented a strong case for a death sentence.

The defense prepared a robust case for life.  Both Mr. Tanner and Mr. Weiser questioned defense witnesses in the penalty phase.  The defense framed their case in opening arguments, telling jurors that "how he was brought up" as a child made Norman the violent man he became.  Tr. Vol. 91 at 59.  The defense pleaded for jurors to "[l]ook for remorse" throughout the punishment phase.  Tr. Vol. 91 at 60.[12]  The defense presented testimony from twenty-one witnesses during its case-in-chief. These witnesses included Norman's family members,[13] friends, and teachers.  The Court summarizes their humanizing narrative below.

Norman was born in Houston, Texas.  Norman's father abused alcohol and drugs.   Norman's parents fought constantly, including physical altercations. Norman's father would cyclically abuse his wife, apologize, and then abuse her again. His mother once stabbed his father in the arm.  When she was pregnant with Norman, Norman's father once struck his mother in the back, causing her to fall.  Norman's mother took the children to California to get away from her husband.

---

[12]     The State tried to diffuse Norman's remorse argument by contending that Norman only testified against his co-defendant to improve his legal situation.  Even then, Norman said that he killed victim Tiffany Peacock for no particular reason.  Tr. Vol. 91 at 26. Because Norman disclaimed shooting the victims in his initial police statements, the State argued that Norman would not admit to anything until the evidence compelled him to do so.

[13]     These witnesses included: Emanda Michelle Norman, Norman's mother; Terri Gibbs, his paternal uncle; Alice Frederick, Norman's paternal grandmother; Annie Norman, his maternal grandmother; Thomas Norman, his older brother; Cherish Norman, his younger sister; Nikita Jones, the mother of his then four-year-old son; and Mokeshua Norman, his sister.

Norman's father eventually joined the family in California.  Norman's father, however, could not find employment.  His parents began to fight constantly again, often in front of the children.  The family moved frequently, often staying in shelters in the Watts neighborhood of Los Angeles and other areas known for their high gang activity.

Norman's father and uncle sold drugs to make a living.  Eventually, Norman's mother began selling drugs also.  They associated with gang members, which often resulted in violence.  Gang members once shot at a house in which they were living.  Norman's father stabbed a man in the chest at the beginning of the Rodney King riots.

Norman's father administered harsh physical abuse.  The children feared their father who whipped them if they got out of line.  Norman's father raised him to be tough and a fighter.  Still, witnesses described Norman as a sweet, playful child with good manners who would dance around and make people laugh.

A police officer shot Norman's father when Norman was young.  When Norman heard the news, he "started screaming" and "hitting the ground," and it was "just like he just died himself."  Tr. Vol. 94 at 24.  Norman had been close to his father.  After his father's death, Norman's attitude changed.  He became quiet and sullen.  He felt like he had no one in his life and no one could help him.

At age eleven, Norman's family moved to Edna, Texas, to live with his grandfather.  Norman attended special education classes in school for help with reading and math.  Norman fathered three children while in high school.  Witnesses described him as a good father who loved and cared for his children.  His friends described him as a helpful, respectful person who did not fight.  One witness testified that Norman genuinely regretted his actions.  Norman planned to attend college with hopes of becoming a coach.

Teachers from Edna explained that Norman was respected.  Even when he lost

14

his temper he did not become violent.  Norman had learning disabilities and received accommodations such as having tests read aloud.  Witnesses described him as polite, fully cooperative, and willing to follow rules.  Other children liked Norman.  He held a lot of anger inside about his father's death, but never showed it.

Against the advice of counsel, and after being admonished on the record by counsel and by the court, Norman testified on his own behalf.  Norman presented his own view of his childhood, including his rough upbringing in a world of drugs and violence.  He explained how his life became worse after his father's death, and how he began following his father's poor example.  Against that background, Norman explained that he had tried to change his life since his arrest.  Norman testified that he was remorseful for his actions.  He said that he had cooperated with the prosecution because it was the right thing to do.  He initially had serious difficulty adjusting to prison, but had not been violent in a year.  He wanted to teach his sons to not follow the same path in life that he took.  He wished that he had understood how wrong his life had become before it led up to the murders.  Norman explained that he had dreams about two of the victims, which made him want to make things right.

The defense did not call any expert witnesses.

In closing arguments, trial counsel strenuously argued that jurors should find that mitigating circumstances required a life sentence.  Trial counsel began framing the argument for a negative answer to the second special issue by emphasizing Norman's remorse and his acceptance of responsibility.  Trial counsel detailed remorse that extended from Norman's police statements, to his testimony in the co-defendant's trial, to his grand jury testimony, to his guilty plea, to his own punishment-phase testimony.  Tr. Vol. 98 at 30-37.  The defense's argument then shifted to reducing Norman's moral blameworthiness because of his background.  Trial counsel painted a picture of the extreme violence that swirled about Norman's

15

youth, culminating in hearing that his father had been killed.  Tr. Vol. 98 at 37-40.
Trial counsel pleaded with jurors: "are we as a society going to kill that kid who was
out there when is dad laid on that ground dead?"  Tr. Vol. 98 at 41.  Counsel also
argued that absence of professional help exacerbated all of the violence and death in
his life, leaving him an "[a]ngry, hurt and pained young man."  Tr. Vol. 19 at 41.

The jury answered Texas' special issue questions in a manner requiring the
imposition of a death sentence.

### E.   **Appellate and Post-Conviction Review**

Norman subsequently availed himself of Texas appellate and post-conviction
remedies.  Through appointed counsel, Norman raised four points of error on direct
appeal.[14]  On February 16, 2011, the Texas Court of Criminal Appeals affirmed
Norman's conviction and sentence.  *Norman v. State*, No. AP-76,063, 2011 WL
1158574 (Tex. Crim. App. Feb. 16, 2011).

Norman raised six grounds for relief in a state habeas application, including
allegations of ineffective trial representation.[15]  Norman summarily argued that trial

---

[14]    On direct appeal, Norman raised the following claims: (1) the State's
punishment-phase jury argument suggesting that he may have committed unknown crimes
before age ten violated federal and state law; (2) the trial court should have *sua sponte*
provided the jury with a life-without-parole sentencing option because the Texas statute
authorizing that punishment went into effect one week after Norman's sentencing; (3) by
giving his opinion throughout his questioning of witnesses, the prosecutor effectively became
a witness for the State; and (4) the death penalty violates federal and international law.

[15]    Terry McDonald, Esq. represented Norman on state habeas review.  Norman raised
the following claims in the state habeas application: (1) trial counsel provided deficient
representation by conferring about matters with the prosecution, by agreeing not to object to
leading questions, and by accepting a gift from one victim's mother; (2) trial counsel was
ineffective in the investigation and presentation of mitigating evidence; (3) trial counsel
failed to call witnesses to establish that one victim's mother had forgiven Norman for the
murders; (4) trial counsel should have objected when the prosecution's closing argument
(continued...)

counsel provided ineffective representation "due to counsel's failure to properly investigate and present mitigation evidence that [Norman] suffered from a *chemical brain imbalance*."  State Habeas Record at 5 (emphasis added).[16]  Norman, however, did not support this allegation with any expert assessment or other evidence showing that he actually suffered from a chemical imbalance.

Norman employed a state habeas investigator, Ann Matthews, who conducted a new examination into mitigating factors from Norman's life.  State Habeas Record at 22-27.  Trial counsel Mr. Tanner provided an affidavit explaining the defense's investigation into potential mental health evidence.  Both Mr. Tanner's affidavit and in the subsequent state court's findings and conclusions erroneously refer to Dr. Wills as a neuropsychologist.  Mr. Tanner averred that he "did investigate the possibility of a chemical brain imbalance" by having Dr. Wills perform an examination, but opined that Dr. Wills' "overall testimony would have been detrimental to our case if I had called him to testify."  Supp. State Habeas Record at 28.  Mr. Tanner, however, did not specify what Dr. Wills had uncovered that posed serious concerns.

The state habeas court found that "trial counsel acted diligently in investigating whether or not [Norman] had a chemical brain imbalance and decided as a matter of trial strategy not to call the neuropsychologist who did the examination to testify. [Norman] was not denied effective assistance of counsel in this regard."  Supp. State

---

[15]     (...continued)
effectively made him a witness; (5) the State's punishment-phase jury argument suggesting that he may have committed unknown crimes before age ten violated federal law; and (6) the State presented false testimony through an expert on prison classification.

[16]     Norman alleged that "[t]rial counsel was ineffective in failing to develop and present evidence of the chemical imbalance suffered by [Norman].  This condition is clearly mitigating evidence.  Counsel requests a hearing to further develop the allegations contained in [his state habeas investigator's] affidavit."  State Habeas Record at 16 (emphasis added).

Habeas Record at 42.  The Texas Court of Criminal Appeals denied relief on August 22, 2013.  *Ex parte Norman*, No. WR-74,743-01 (Tex. Crim. App. 2012) (unpublished).

During the pendency of his habeas action, Norman filed a *pro se* "Motion For Leave to File Amended Notice of Appeal" that the courts characterized as an attempt to file a successive state habeas application.  Among other claims, Norman complained that his state habeas attorney failed to present expert testimony at trial:

> Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendment to the United States Constitution due to the trial. counsel's failure to present a mitigating ex[p]ert (even after billing the court for numerous hours of mitigation) to testify [to] the Appellant's moral culpability and to offer expert analysis on why Appellant committed bad acts in his incarceration.  And to offer the jury evidence of the Appellant, at the age of five, being forced to perform oral sexual acts on his female family member.[17]

On the same date that it denied his first application, the Court of Criminal Appeals found that Norman had not met Texas' stringent requirements for the filing of a successive state habeas application.  *Ex parte Norman*, No. WR-74,743-01 (Tex. Crim. App. 2012) (unpublished).

Federal review followed.

---

[17]     The record does not contain any additional information about this allegation of sexual abuse.

### III.   AEDPA AND LIMITS OF FEDERAL HABEAS REVIEW

Norman's federal habeas petition challenges his trial attorneys' investigation, preparation, and presentation of expert evidence to defend against a death sentence. Respondent argues that this Court cannot reach the merits of Norman's unexhausted federal claims and that, alternatively, they are without merit.  The writ of habeas corpus provides an important, but narrow, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  How an inmate has litigated his claims in state court determines the course of federal habeas adjudication.   Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" Exhaustion "reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).

As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate claims in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A federal court may only review an inmate's unexhausted or procedurally barred claims if he shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'"  *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits,

AEDPA provides for a deferential federal review.  "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief."  *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error. Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1399 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

With those standards in mind, the Court turns to Norman's federal petition.

## IV.   ANALYSIS

Norman's amended federal petition has refined his *Strickland* claim.  Norman now relies on two theories: (1) trial counsel "fail[ed] to place the events of Mr. Norman's life into an understandable context" by failing to follow the investigator's recommendation to hire a neuropsychological expert[18] and (2) the prosecution's

_____

[18]     As previously discussed, Norman's trial investigator recommended that his attorneys seek the services of a neuropsychologist.  Norman argues:

> Ms. Perry raised the issue of childhood PTSD and suggested that a neuropsychologist be retained to evaluate Mr. Norman in order to provide the jury with a psychological framework to put Mr. Norman's horrific childhood environment in a context which would enable the jury to understand how these events can severely impact a child's development and hinder his ability to interact with others and in society.

Doc. # 52, p. 6.  Although Mr. Tanner attempted to hire a neuropsychologist, Dr. Hamza, his office partner Dr. Wills examined Norman.  Dr. Wills did not posses the requisite training
(continued...)

"abusively overbroad subpoena duces tecum" intimidated Dr. Cunningham into withdrawing and "interfere[d] with counsel's ability to make independent decisions about how to conduct the defense."  Doc. # 52, pp. 12-13.  Respondent argues that Norman's federal claims are both procedurally deficient and lack merit.

### A.    Procedural Bar

Even though he raised a *Strickland* claim in state court, Respondent contends that Norman did not exhaust the specific allegations contained in his amended federal petition.  Respondent argues that "[i]f he tried to exhaust the issues by filing a third state habeas application, the [Texas Court of Criminal Appeals] would surely dismiss the application as an abuse of the writ.  As a result, Norman's unexhausted claims are defaulted."  Doc. # 60, p. 45.  The somewhat similar claim Norman raised in state court does not suffice to exhaust the specific arguments he has made in these proceedings.  Norman concedes that his federal claims are unexhausted.  Doc. # 62, p. 2.  Norman's failure to advance the issues in a procedurally actionable manner creates a presumption precluding federal review of their merits.

Norman must show cause and actual prejudice to overcome the default of his claims.  This requirement is not disjunctive; a petitioner must show both cause *and* actual prejudice to allow plenary review of the merits.  *See Martinez v. Ryan*, ___ U.S. at ___, 132 S. Ct. 1309, 1321 (2012) (remanding because "the court did not address the question of prejudice").  The procedural bar precludes federal review if an inmate cannot meet either prong.  *See United States v. Frady*, 456 U.S. 152, 168 (1982); *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013).

Norman contends that state habeas counsel's failure to advance the federal

---

[18]     (...continued)

to provide neuropsychological testing, but limited his examination to general psychological principles.

claims amounts to "cause." The "cause" test relies on *Strickland*'s ineffective-assistance-of-counsel standard to assess an attorney's efforts. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 492 (1986).[19] Under *Martinez v. Ryan*, ___ U.S. at ___, 132 S. Ct. 1309 (2012), a petitioner may specifically meet the cause element by showing "(1) that his claim of ineffective assistance of counsel at trial is substantial–i.e., has some merit–and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013).[20]

Meeting the cause requirement alone, however, is insufficient to overcome a procedural bar. A petitioner must show that state habeas counsel's deficiency resulted in actual prejudice. The Supreme Court has not concretely established what showing a petitioner must make for actual prejudice, beyond explaining that it "is significantly greater than that necessary" to establish plain error on direct review. *Carrier*, 477

---

[19]    "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Smith v. Murray*, 477 U.S. 527, 535 (1986) (quotation omitted). A state habeas attorney "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" because "counsel cannot be deficient for failing to press a frivolous point." *Vasquez v. Stephens*, 597 F. App'x 775, 780 (5th Cir. 2015) (quotations omitted).

[20]    Norman argues that a state avenue of relief remains open to him. The Texas Court of Criminal Appeals has traditionally refused to authorize successive habeas proceedings based on the ineffective assistance of habeas counsel. *Ex parte Graves*, 70 S.W.3d 103, 111 (Tex. Crim. App. 2002). Norman, however, cobbles together statements from dissenting opinions to suggest that the Court of Criminal Appeals may reconsider its jurisprudence. Norman has not shown that state review is currently open to him or that state law will change. *See Ex parte Alvarez*, No. 62,426-04, 2015 WL 1955072 (Tex. Crim. App. Apr. 29, 2015) (implicitly refusing to overrule *Graves*). Further, for the reasons discussed below Norman's failure to meet the *Martinez* requirements or substantively prove entitlement to relief discourages any stay of these proceedings. *See Rhines v. Weber*, 544 U.S. 269, 278 (2005) (authorizing a stay only when a claim is "potentially meritorious").

U.S. at 493-94.  The Fifth Circuit has held that actual prejudice requires more than "a possibility of prejudice," but involves errors that "worked to [the inmate's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir.2008); *see also Hernandez*, 537 F. App'x at 542; *Barrientes v. Johnson*, 221 F.3d 741, 769 (5th Cir. 2000).

In the instant case, Norman's arguments to overcome the procedural bar implicate, and in fact merge with, a review of the substantive merits of his *Strickland* claims.  Because the posture of Norman's federal claims interlinks the discussion of the procedural and substantive issues, the interests of judicial economy favor addressing conjunctively the questions of whether habeas counsel provided ineffective assistance and whether Norman's barred ineffective-assistance-of-trial-counsel claims alternatively merit relief.

### B.  <u>Deficient Performance</u>

Essentially, both of Norman's claims fault trial counsel for not relying on experts to craft a more focused defense case.  Norman argues that trial counsel should have retained experts who (1) apparently like Dr. Joan Weaver Mayfield, would have provided a neuropsychologist's perspective on how his background shaped his actions; and (2) apparently like Dr. Cunningham, would have addressed his future threat to society.

### 1.  Neuropsychologist

Norman faults trial counsel for not following his trial investigator's recommendation to have neurological testing performed.  Norman's original defense team included at least two psychologists, with Dr. Gleeson apparently operating as a mitigation investigator and Dr. Cunningham focusing on developing evidence to support favorable answers to the special issues.  After Mr. Tanner assumed duty as

first chair counsel, he employed the services of a dedicated mitigation investigator. At the investigator's urging, he sought the services of a neuropsychologist, but Dr. Wills, who only had training as a psychologist, subsequently examined Norman.[21] Dr. Wills told Mr. Tanner that Norman "was not seriously impaired." State Habeas Record at 28.[22] Mr. Tanner opined that Dr. Wills' "overall testimony would have been detrimental to [the] case[.]" State Habeas Record at 28. The record does not contain full insight into what helpful or harmful testimony Dr. Wills could have provided. Trial counsel ultimately presented a punishment defense without calling any mental health expert.

"[D]ecisions as to which, if any, expert a particular defendant requires are fact sensitive and necessarily vary from case to case." *Carter v. Mitchell*, 443 F.3d 517, 527 (6th Cir. 2006). When informed by a proper understanding of his client's background, an attorney has wide latitude in the selection of expert witnesses. "The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'" *Hinton v. Alabama*, ___ U.S. ___, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 U.S. at 690). Here, the state habeas court endorsed trial counsel's choice not to call a mental health expert at trial in a effort to prevent the jury from hearing negative information about Norman. Supp. State Habeas Record at 42.

This Court authorized funds for Norman to retain a neuropsychological expert. Over a two-day period in October, 2014, neuropsychologist Dr. Mayfield examined

---

[21]    On state habeas review, both trial counsel and the state habeas court erroneously referred to Dr. Wills as a neuropsychologist.

[22]    The document purporting to be a statement from Ms. Perry suggests that Dr. Wills arrived at a diagnosis of antisocial personality disorder. Doc. # 53, Exhibit 3.

Norman at the Polunsky Unit and administered various testing instruments.  Doc. #53; Report of Dr. Joan Mayfield dated November 14, 2014.  Norman scored in the average to low average range on much of the psychological testing.  The testing did not raise any significant neurological concern.  A WAIS-IV test to calculate his cognitive functioning resulted in a Full-Scale IQ score of 93, well within the average range. Using the Woodcock Johnson III Test of Achievement, Dr. Mayfield assessed his academic functioning in the low average range and his fluency abilities below average.  Dr. Mayfield used the WAIS-IV, TOMAL-2, and CPT to evaluate Norman's Attention and Executive Functioning.  Dr. Mayfield found that Norman generally functioned in the average or low average range.  Dr. Mayfield concluded "[f]rom a neuropsychological perspective, expressive and receptive language, verbal fluency, planning and organization, problem solving, attention, memory, and cognitive flexibility were within normal limits." *Id*. at 6.  With specific relevance to Norman's neuropsychological state, Dr. Mayfield noted: "On a visual scanning and sequencing task strongly related to executive functioning that is sensitive to frontal lobe impairment in particular, Mr. Norman's abilities ranged from the below average to the average range." *Id*. at 4.  In other areas, such as connecting numbers with distractors and cognitive flexibility, he scored in the low average range.  In testing for perceptual organization, memory, language, motor functioning, and visual perceptual functioning, Norman generally performed in the average range, with few areas in which he performed in the low average range.

The major thrust of Dr. Mayfield's findings was that Norman "was raised in a chaotic environment which can be described as a domestic war zone with environmental violence and drugs." *Id*. at 6.  Dr. Mayfield concluded:

> There is no standardized test to evaluate the impact of childhood trauma on an individual.  However, research (Carter, Kay, George & King, 2003) has shown that children who are raised in this type of violent

> atmosphere are at risk for a wide array of problems including:
> externalizing problems (noncompliance, hostility, aggression)[,]
> internalizing problems (anxiety, depression), school problems (poor
> academic performance, truancy, poor problem-solving skills), health
> problems (substance abuse), and social interaction (deficits in social
> skills, social alienation, low empathy, early antisocial behaviors, and
> acceptance of violence in relationships).   Consistent with the research,
> Mr. Norman has experienced many of these problems.  These difficulties
> have shaped his life and the decisions that he has made.

*Id*.  Norman summarizes that Dr. Mayfield "concluded that his life history seriously and negatively impacted his development."  Doc. # 53, p. 12.  Dr. Mayfield's report, however, identified only emotional, not neuropsychological, concerns stemming from Norman's childhood.

At its simplest, Norman's federal claim assumes that trial counsel should have heeded the investigator's recommendation to employ a neuropsychologist.   As Respondent observes, no precedent holds "that an attorney is ineffective for not following a recommendation of an investigator, or for choosing a different expert or even no expert." Doc. # 60, p. 55.  At a more specific level, however, Norman's claim depends on identifying some condition or brain abnormality that he possesses for which neuropsychology uniquely qualifies its practitioners to diagnose, to the exclusion of other mental health professionals.   In addition to training in clinical psychology, a neuropsychologist specializes in administrating psychological tests to evaluate human brain disorders or psychological impairment caused by, or related to, injury to brain tissue.  *See United States v. Kasim*, No. 2:07 CR 56, 2008 WL 4822291, at *4 (N.D. Ind. Nov. 3, 2008) (describing a neuropsychologist as a "specialist of interdisciplinary branch of psychology and neuroscience that aims to understand how the structure and function of the brain relate to specific psychological processes and overt behaviors").

Norman argues that his trial attorneys needed a neurological expert because: (1)

the extreme violence surrounding Norman's childhood "suggested the possibility of infant or childhood PTSD"; (2) "a great deal of research link[s] . . . childhood exposure to [extreme violence to] future drug addiction and usage"; and (3) "[t]here was a possibility of trauma to Mr. Norman's brain."  Doc. # 53, Exhibit 3.  Norman, however, has not pointed to any scientific standards limiting the ability to diagnose PTSD to those with neuropsychological training.  Relatedly, Norman has not provided any indication that a clinical psychologist cannot assess the implications of early exposure to narcotics or violence.  Also, despite investigator Micki Perry Rushton's recommendation, Norman has not pointed to any place in the record containing any indication that he experienced a brain injury.  In fact, Mr. Costas had an MRI performed on Norman.  As Norman explains in his recent briefing, "[n]othing remarkable was found."  Doc. # 62, p. 13.  In sum, nothing in the record suggests that Norman suffers from any condition caused by trauma or other process involving the structure of his brain.  Norman, therefore, has not shown that his trial attorneys were ineffective by not hiring an expert in neuropsychology.

Even so, Norman could not succeed on federal review without showing that additional inquiry into mental-heath evidence would have turned up legally probative information.  Norman's claim hinges on the examination Dr. Mayfield performed on federal review.  Dr. Mayfield's testing did not identify any concern that would have evaded the expertise of the psychologists that trial counsel hired.  Dr. Mayfield listed problems that Norman may have suffered because of his traumatic background, but did not diagnose him with PTSD or any other psychological condition.  Dr. Mayfield did not report any childhood trauma or injury.  The capstone of her review was her opinion that Norman's background put him at risk for aggression, hostility, school problems, poor social interaction, and acceptance of violence in relationships.  Norman summarizes: "Dr. Mayfield concluded that [he] was scarred by his

childhood[.]" Doc. # 62, p. 32. Dr. Mayfield did not put her conclusions in a context unique to neuropsychology or raise any serious neuropsychological concern.

In fact, Dr. Mayfield only blandly opines that Norman's difficult background "shaped his life and the decisions that he has made." Doc. # 53, Exhibit 4. At trial, even without expert witnesses, the defense enabled the jury to see in detail that Norman's family's violent treatment and his chaotic childhood influenced him generally. Even without the gloss of professional psychological opinions, the jury had before it sufficient information to infer that the lawlessness and violence of others during Norman's youth shaped him negatively. Because Norman thus has not shown that a neuropsychologist's evaluation during trial preparation or the state habeas process would have introduced any meaningful, unique information into the calculus of sentencing, Norman has not demonstrated that the lack of presentation of testimony from a neuropsychologist at trial constituted deficient performance.

Indeed, while possibly not perfect, Norman's defense team performed a wide-ranging investigation that resulted in a sturdy punishment phase defense involving numerous witnesses. Norman's attorneys explored facets of his mental health and background with the assistance of various psychologists. Nothing suggested the specific need for neurological assistance. The defense painted a detailed and elaborate portrait of Norman's life from which lay observers could arrive at the same conclusions formed by his expert on federal review. Norman has not shown that trial counsel's choice and utilization of experts constituted legally cognizable deficient performance. Whether considered in the *Martinez* or *Strickland* contexts, no relief can be granted on Normans' theory concerning the absence of neuropsychological testimony.

28

### 2.    Future Dangerousness

Mr. Costas sought Dr. Cunningham's assistance early in the case to formulate a defense to both special issue questions.  Dr. Cunningham is a familiar face in capital prosecutions.  Dr. Cunningham is known for "his research concerning factors that predict violence in prison and his research in capital sentencing."  *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010).  When impeded by the State's broad subpoena, the defense maintained that "[n]ot having a 'future danger' expert at the beginning, middle, or end of a death penalty case is ineffective assistance of counsel."  Clerk's Record at 205.  By the time Mr. Tanner began representing Norman, he did not – or could not – rely on Dr. Cunningham to serve as the backbone of a future-dangerousness defense.

Now, Norman contends that Dr. "Cunningham could easily have provided Mr. Norman's mitigation presentation with the expert assistance it needed," because his reliance on "scientific evidence would clearly have demonstrated that capital offenders, given a life sentence, present a very low risk for future violent behavior and undermined the state's case for death."  Doc. # 52, pp. 13-14.  Norman's argument continues, Mr. Tanner, however, "refused to pursue the issue."  Doc. # 52, p. 13. Thus, Norman concludes, "[w]hether the failure to present expert testimony is the result of trial counsel's ineffective decision making or trial court/government interference, Mr. Norman had no meaningful opportunity to challenge the state's case for death by demonstrating his relative lack of culpability or by demonstrating that he posed no threat of future criminal behavior if given a life sentence."  Doc. # 52, p. 14.

The Court initially observes that it was not clear that Norman's original trial attorneys intended to call Dr. Cunningham as a witness.  During the proceedings surrounding the State's subpoena, the defense specified that Dr. Cunningham was only a "consulting" expert.  Tr. Vol. 24 at 42.

Further, the record and pleadings do not disclose specifically what testimony

Dr. Cunningham would have provided or how scientific principles would apply to his case.  Dr. Cunningham in other capital cases has testified concerning "the violence risk assessment factors that he uses to assess the probability of future dangerousness in prison."  *Coble*, 330 S.W.3d at 282.  There is no report or affidavit from Dr. Cunningham, however, the handwritten notes attached to Norman's petition do not establish how Dr. Cunningham applied general psychological principles to the discrete facts of Norman's case.  Dr. Cunningham could have provided jurors a general overview of the risks posed by death-sentenced prisoners while incarcerated, but there is no indication how he assessed the specifics of Norman's situation.  This Court is not permitted to speculate on any testimony Dr. Cunningham might have provided.

Furthermore, Norman's post-arrest, pre-trial conduct was problematic.  Any expert gauging how Norman would act if given a life sentence would have to consider Norman's misbehavior during the pre-trial period, including his escape efforts and possession of alleged contraband and weapons.  It is not disputed that Norman had held a shank to a jailor's neck.  Norman has thus not met *Strickland*'s deficient-performance prong, either in the ineffective-assistance-of-trial or of-habeas counsel context.  This failure to prove deficient performance dooms his *Strickland* claim and his *Martinez* argument.

## C.   **Actual Prejudice**

The Court also notes that Norman has not shown actual prejudice from his attorneys' alleged omissions or errors.  Norman contends that "[t]he failure to place the events of Mr. Norman's life into an understandable context deprived Mr. Norman of any meaningful method to argue for a sentence less than death.  There was no basis from which the jury could conclude that his moral culpability of his conduct did not warrant a death penalty."  Doc. # 53, p. 12.  This argument lacks foundation.  The defense called numerous witnesses in the punishment phase.  Their testimony

provided a fulsome view into the unfortunate and turbulent circumstances and extreme violence that defined Norman's childhood. The jury was taught that Norman grew up in a world defined by extreme poverty, drug dealing, and gang violence. Even when his family moved from that world to Edna, Texas, after his father's death, Norman did not succeed in school. Witnesses testified about their views of his good character.

Yet, the mitigating evidence also worked to Norman's disadvantage. Norman's life was one of contrasts. Norman has not pointed to any psychological condition that prevented him from controlling his actions. Despite his hard work in school, success as an athlete, and evidence of good character towards those he loved, jurors had to contrast acts of violence in the murders and thereafter.[23] Jurors were permitted to conclude that Norman's own choices drove him to violence. The State thus had a strong argument that Norman would not control his own behavior even in an institutionalized setting.

Norman in his post-conviction proceedings has not adduced evidence that meaningfully adds to the evidentiary picture the jury had before it. Nor has Norman shown that the addition of psychological or neuropsychological testimony would have measurably strengthened the impact or importance of the mitigation evidence his trial attorneys put before jurors.

Whether in the context of *Martinez*'s actual-prejudice standard or *Strickland*'s reasonable-probability-of-a-different-result inquiry, Norman has not shown a reasonable likelihood of a different result at trial had his attorneys further investigated or presented additional evidence as he argues they should have. Thus, Norman has

---

[23]     As noted, Norman had a lengthy criminal history that escalated from armed robbery at age 10 to the execution-style murders of three people, two of which were his friends, at age 19. During his early incarceration, he attempted escape, threatened a jailor, and possessed one or more items characterized by the authorities as weapons.

not overcome the procedural bar and, alternatively, has not shown that his claims merit federal habeas relief.

### D.   Conclusion

Norman did not exhaust the claims he asserts in his federal habeas petition, and thus there is a procedural bar to consideration of their merits.  Norman has not met the *Martinez* cause and actual prejudice standard to overcome that procedural deficiency. Alternatively, even if Norman were deemed to have overcome the procedural hurdles to federal review, he has not shown that trial counsel's representation amounted to deficient performance that would have a reasonable probability of causing a different result under *Strickland*.  Whether as a procedural or merits decision, Norman falls short of the high standards for federal habeas relief.

## V.   CERTIFICATE OF APPEALABILITY

AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  Norman has not sought a Certificate of Appealability ("COA"), though this Court may consider the issue *sua sponte*.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right,"  28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition

should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. Where denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

After careful review of the pleadings and the applicable law, the Court concludes that reasonable jurists would not find that this Court was incorrect in its procedural ruling or that the Court's assessment of the constitutional claims was debatable or wrong.  Because Norman does not otherwise allege facts showing that his claims could be resolved in a different manner, this Court will not certify for appeal any of his habeas claims for consideration by the Court of Appeals for the Fifth Circuit.

## VI.   **CONCLUSION AND ORDER**

For the reasons discussed above, Norman has not shown an entitlement to federal habeas relief.  It is therefore

**ORDERED** that LeJames Norman's Petition for a Writ of Habeas Corpus is **DENIED WITH PREJUDICE**.  It is further

**ORDERED** that no certificate of appealability will issue in this case.

SIGNED this 30th day of September, 2015.


_____
NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

33